# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **EDDIE J. SYKES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) CIVIL NO. 08-cv-76-DRH |
| | ) |
| **DAVID ALFON,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**HERNDON, Chief District Judge:**

Plaintiff, an inmate at the Menard Correctional Center ("MCC"), brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. Also before the Court is Plaintiff's motion for appointment of counsel (Doc. 5). Plaintiff seeks injunctive and monetary relief for the alleged denial of medical care for his medical need (enlarged prostate) in violation of the Eighth Amendment and for violations of his right to due process of law in connection with a disciplinary proceeding. This case is now before the Court for a preliminary review of the complaint pursuant to 28 U.S.C. § 1915A, which provides:

> (a) **Screening.**– The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) **Grounds for Dismissal.**– On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
> > (1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or
> > (2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A. An action or claim is frivolous if "it lacks an arguable basis either in law or in

fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007).

**THE COMPLAINT**

Plaintiff's complaint is a chronology of his attempts to secure medical treatment for what Plaintiff alleges is an enlarged prostate. Plaintiff asserts that his enlarged prostate causes him to vomit, to be constipated, and to have difficulty urinating. The following allegations are as asserted by Plaintiff in his complaint.

On December 13, 2006, Plaintiff arrived at Shawnee Correctional Center ("SCC") and he immediately filed a medical services request form concerning his prior history of an enlarged prostate and related symptoms. On December 20, 2006, Plaintiff was examined by Nurse Practitioner Linda Runge who believed that Plaintiff had an enlarged prostate and ordered x-rays be taken. Plaintiff appears to claim that the one week delay between the date of his medical service request and this examination violated his constitutional rights.

On December 21, 2006, x-rays were taken by Linda Dailey who determined that there was nothing wrong with Plaintiff.

On December 29, 2006, Plaintiff was vomiting and experiencing his other symptoms when his cell mate called for assistance. Plaintiff states that it took thirty minutes for Defendant Handcock to respond to this request. Plaintiff was taken to the health care unit (HCU) at SCC and examined by Nurse Dorsey (not a defendant in this action). Dorsey determined that Plaintiff had a high fever and high blood pressure and called the doctor who directed that Plaintiff me sent to an outside hospital. Plaintiff was taken to the Heartland Hospital ("Heartland") and examined by a doctor (not

2

a defendant in this action). That doctor at Heartland determined that nothing was wrong with Plaintiff and ordered him back to SCC. Upon his return to SCC, Plaintiff was placed in the HCU. On December 30, 2006, Plaintiff was returned to his cell because the HCU needed his space.

On January 8, 2007, Plaintiff saw Defendant Dr. David Alfon concerning Plaintiff's alleged symptoms. Defendant Alfon informed Plaintiff that the medical report indicated that Plaintiff was fine. Plaintiff argued that Heartland "could have overlooked my problem." In any event, Defendant Alfon provided no treatment for Plaintiff's condition or symptoms.

On January 10, 2007, Plaintiff was moved to the HCU for his alleged medical symptoms (vomiting, constipation, and difficulty urinating). Defendants Alfon and Runge placed Plaintiff on a liquid diet. Plaintiff remained in the HCU until January 12, 2007. During this time, Plaintiff states that he vomited several times and that this was observed by nurses Jason, Rhonda, Debbie, and Jerry. Despite observing Plaintiff's vomiting episodes, the nurses did not record the same in Plaintiff's medical records. Consequently, Defendant Alfon ordered plaintiff back to his cell.

On January 15, 2007, Plaintiff was examined by Defendant Runge who informed him that he did not have an enlarged prostate.

On January 18, 2007, Daily took additional x-rays. Again, Daily reported that the x-rays were negative for an enlarged prostate.

On January 30, 2007, Plaintiff obtained a pass to see Defendant Alfon, but Alfon refused to see Defendant.

In February or March, Plaintiff was again examined by Defendant Alfon who - at that time - determined that Plaintiff had an enlarged prostate. Defendant Alfon placed Plaintiff on two medications: Terzosin 1 milligram, and Hytrin 1 milligram. Plaintiff objected to the dosage amount

3

for the Hytrin. Plaintiff claims that he had previously been taking a higher dosage of Hytrin (5 milligrams) that was effective in treating his condition. When the dosage was lowered, Plaintiff claimed to suffer his symptoms. Despite this, Defendant Alfon kept the dosage of Hytrin at 1 milligram.

In April, Defendant Alfon increased the dosage on the Hytrin from 1 milligram to 2 milligrams.

On or about May 13, 2007,[1] Plaintiff appeared at the HCU complaining of his usual symptoms plus chest pains and pain on his left side. After about forty-five minutes, Plaintiff was examined by nurse Bowling (not a defendant), who determined that Plaintiff had a fever and high blood pressure. Bowling instructed Plaintiff to wait in the waiting area and she would re-check his temperature and blood pressure in about an hour. Defendant Nurse Rhonda, however, stated that Plaintiff did not have a medical emergency and instructed Plaintiff to return to his cell or be issued a conduct violation.

On July 3, 2007, Plaintiff again appeared at the HCU complaining of his usual symptoms. Defendant Nurse Paula and Defendant Nurse Littrell instructed Plaintiff to take some Pepto-Bismol. Plaintiff claims that Defendants Paula and Littrell denied him adequate medical treatment.

On July 5, 2007, Plaintiff fell from the top bunk in his cell due to pain from his usual symptoms. Several corrections officers - including Defendant Groaning - responded to the emergency call. While Plaintiff was being placed on a stretcher, he heard one of the officers say "he smells like shit." Another officer stated "he don't shit." At the HCU, Plaintiff contends no x-rays were taken. Furthermore, Plaintiff states that when the nurse on duty called Defendant Alfon, he

---

[1]Plaintiff alleges that it could be June 13, 2007.

instructed her to return Plaintiff to his cell.

On July 20, 2007, Plaintiff was again experiencing his usual symptoms. Two corrections officers, Defendant Rhonda, and Defendant Handcock came to Plaintiff's cell and had him transported to the HCU. At the HCU, Defendant Runge told the others that there was nothing wrong with Plaintiff. During this time, Defendant Rhonda attempted to give Plaintiff a shot of an undetermined substance. Plaintiff avoided this injection and was returned to his cell. Defendant Runge, however, ordered that water be turned off in Plaintiff's cell - for the alleged purpose of wanting to examine Plaintiff's emesis (i.e., vomit or act of vomiting).[2] Plaintiff states that he remained in the "dry cell" for five days.

During this time, Plaintiff was examined by Defendant Reeves, a mental health professional. Reeves reported to other prison officials that Plaintiff intended to "get even" with Defendant Runge. This information - combined with similar information from a confidential informant - led to Plaintiff being charged with a conduct violation for making threats and intimidation. Plaintiff was found guilty of the violation and received the following disciplinary sanctions: (1) 3 months confinement on segregation; (2) loss of 3 months good conduct credit; and (3) disciplinary transfer.

**DISCUSSION**

At the beginning, the Court notes that Plaintiff is no longer confined at the SCC, but, as noted above, is currently confined at MCC. Consequently, Plaintiff's request for injunctive relief is moot unless he can demonstrate that he is likely to be retransferred to SCC. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th cir. 1996). Plaintiff has not made such a showing and, therefore, his

---

[2]It appears prison officials believed that Plaintiff may have been inducing himself to vomit. For purposes of this review, though, we construe the facts in Plaintiff's favor and assume that Plaintiff was not inducing himself to vomit.

claim for injunctive relief should be dismissed pursuant to 28 U.S.C. § 1915A.

**A. Disciplinary action.**

To the extent that Plaintiff challenges the disciplinary action, his claim should also be dismissed pursuant to § 1915A. When a plaintiff brings an action under § 1983 for procedural due process violations, he must show that the state deprived him of a constitutionally protected interest in "life, liberty, or property" without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). An inmate has a due process liberty interest in being in the general prison population only if the conditions of his or her confinement impose "atypical and significant hardship...in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Seventh Circuit Court of Appeals has adopted an extremely stringent interpretation of *Sandin*. In this Circuit, a prisoner in disciplinary segregation at a state prison has a liberty interest in remaining in the general prison population only if the conditions under which he or she is confined are substantially more restrictive than administrative segregation at the most secure prison in that state. *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997). If the inmate is housed at the most restrictive prison in the state, he or she must show that disciplinary segregation there is substantially more restrictive than administrative segregation at that prison. *Id.* In the view of the Seventh Circuit Court of Appeals, after *Sandin* "the right to litigate disciplinary confinements has become vanishingly small." *Id.* Indeed, "when the entire sanction is confinement in disciplinary segregation for a period that does not exceed the remaining term of the prisoner's incarceration, it is difficult to see how after *Sandin* it can be made the basis of a suit complaining about a deprivation of liberty." *Id.*

In the case currently before the Court, Plaintiff was placed on disciplinary segregation for 3 months. Nothing in the complaint or exhibits suggests that the conditions that he had to endure

while in disciplinary segregation were substantially more restrictive than administrative segregation in the most secure prison in the State of Illinois.

A loss of good conduct credit, however, does implicate a liberty interest because such a loss potentially affects the length of Plaintiff's sentence. However, the proper method for challenging the revocation of good time credit is habeas corpus, but only after Plaintiff has exhausted his remedies through the Illinois state courts. *See, e.g., Heck* v. Humphrey, 512 U.S. 477, 480-81 (1994). The Illinois courts have recognized mandamus as an appropriate remedy to compel prison officials to award sentence credit to a prisoner. *See Turner-El v. West,* 811 N.E.2d 728, 733 (Ill. App. 2004) (citing *Taylor v. Franzen*, 417 N.E.2d 242, 247, *aff'd on reh'g*, 420 N.E.2d 1203 (Ill. App. 1981)). The State of Illinois must first be afforded an opportunity, in a mandamus action pursuant to 735 ILCS 5/14-101 *et seq*. to consider the merits of Plaintiff's claim. Accordingly, this claim is dismissed without prejudice to Plaintiff bringing his claims in a properly filed habeas corpus action, **but only after he has exhausted his state court remedies**.

**B. Medical claims.**

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994). This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but it stops short of "negligen[ce] in diagnosing or treating a medical condition." *Estelle,* 429 U.S. at 106. *See also Jones v. Simek,* 193 F.3d 485, 489 (7th Cir. 1999); *Steele v. Choi*, 82 F.3d 175, 178 (7th Cir. 1996), *cert. denied,* 519 U.S. 897 (1996).

> A prisoner raising an Eighth Amendment claim against a prison official therefore must satisfy two requirements. The first one is an objective standard: "[T]he

7

deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at —, 114 S.Ct. at 1977. As the Court explained in *Farmer*, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* The second requirement is a subjective one: "[A] prison official must have a 'sufficiently culpable state of mind,'" one that the Court has defined as "deliberate indifference." *Id; see Hudson v. McMillian*, 503 U.S. 1, 5, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) ("[T]he appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited 'deliberate indifference.'"); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'").

*Vance v. Peters,* 97 F.3d 987, 991-992 (7th Cir. 1996), *cert. denied,* 520 U.S. 1230 (1997).

In the instant case, Plaintiff alleges that he has a chronic prostate problem from which he has suffered since 2002. During the seven months covered by the complaint (December 13, 2006, to July 20, 2007), Plaintiff has been examined by medical personnel (a doctor, nurse practitioner, or nurse) on ten separate occasions; was sent to an outside hospital for examination once; placed in the HCU for three days; had x-rays taken (with negative results) on two separate occasions; and was prescribed medication for an enlarged prostate (with a follow-up appointment that resulted in the medication being adjusted).

The complaint indicates that the results of these medical examinations and testing has been inconclusive in identifying a physical problem for Plaintiff's alleged symptoms. For example, Plaintiff alleges that the doctor at Heartland Hospital found no physical problem. The x-rays taken of Plaintiff are also alleged to have been "negative." At some points, Plaintiff has been told that he has an enlarged prostate and given medication for that condition. At other points, Plaintiff has been told that he does not have an enlarged prostate.

Taken as a whole, it is clear that Plaintiff has not been *denied* medical care for his alleged condition. Plaintiff may complain about how timely the care provided was, but that is a *delayed*

medical care claim, not a denial of medical care claim. In this case, the delay in medical care was fairly minimal. The delays ranged in length from thirty minutes to one week. Plaintiff, however, has not alleged how these minimal delays in treatment caused him additional problems. *See Williams v. Liefer*, 491 F.3d 710 (7th Cir. 2007) (when medical care is delayed - rather than denied - the delay must have caused some detriment).

Furthermore, the gist of the complaint is that Plaintiff is unhappy with the medical treatment he has received especially because, in several instances, medical personnel were unable to confirm that Plaintiff had an enlarged prostate. This unhappiness extends to the amount of medication Plaintiff was prescribed once it was determined that Plaintiff did suffer from an enlarged prostate. An incorrect diagnosis or improper treatment, however, does not state an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). *See also Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) ("Mere negligence or even gross negligence does not constitute deliberate indifference."). Likewise, Plaintiff's mere disagreement with a physician's chosen course of an inmate's medical treatment does not amount to deliberate indifference under the Eighth Amendment. *See Snipes v. DeTella*, 95 F.3d at 591. Upon careful review of the complaint and the supporting exhibits, the Court finds that it does not state a claim of deliberate indifference to Plaintiff's medical needs.

**C. Disparaging words.**

To the extent that Plaintiff seeks damages against certain corrections officers for making disparaging comments about him in connection with the incident on July 5, this claim should be dismissed with prejudice. The isolated use of harsh or defamatory words does not rise to the level of a constitutional violations. *See e.g ., Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997);

*Kincaid v. Vail*, 969 F.2d 594, 602 (7th Cir. 1992).

**DISPOSITION**

In summary, Plaintiff's complaint does not survive review under § 1915A. Accordingly, Plaintiff's Eigth Amendment claims and his claims that certain defendants used disparaging words are **DISMISSED** with prejudice. Plaintiff's due process claims concerning his disciplinary hearing are **DISMISSED** without prejudice Plaintiff is advised that the dismissal of this action will count as a strike under the provisions of 28 U.S.C. § 1915(g). Plaintiff's motion for appointment of counsel (Doc. 5) is **DENIED** as moot.

**IT IS SO ORDERED.**

**DATED:** July 2, 2008.

/s/ DavidRHerndon
**DISTRICT JUDGE**